[Civ. No. 19891.   Second Dist., Div. Three.   Apr. 12, 1954.]

ROYAL INDEMNITY COMPANY (a Corporation), Appellant, v. JACK SHERMAN et al., Respondents.

Anderson, McPharlin & Connors for Appellant.

Pearlson & Pearlson, Herbert D. Pearlson, Myron W. Curson and Alex Chernow for Respondents.

SHINN, P. J.—William Fogel, Joseph W. Wolf and Jack Sherman, as partners, were engaged in the business of selling farm products as produce dealers or commission merchants from April 1, 1947, to July 16, 1949, when Fogel and Wolf withdrew from the firm. Sherman carried on the business until September 24, 1949. Defendants received and sold products for which they failed to pay the shippers. Plaintiff had bonded the three partners, and later Sherman, pursuant to the provisions of division 6, chapter 6 of the Agricultural Code. The bond ran to the state for the benefit of shippers of produce to the defendants. Claims were filed with the Director of Agriculture under section 1265 of the code and in due course plaintiff paid to the Department of Agriculture $5,000 for the license period April 1, 1948, to March 31, 1949; $581.71 for the license period April 1, 1949, to July 16, 1949, and $4,193.27 for the license period July 16, 1949, to September 24, 1949.

The three defendants were adjudged bankrupt and they scheduled the debts owed to their several shippers and also their liabilities to plaintiff as their surety. They received discharges in bankruptcy.

The complaint alleged the foregoing facts, except the fact of bankruptcy, and also that the several defendants "embezzled, willfully misapplied and converted to their own use money and other property belonging to produce consignors of farm products grown in the State of California," etc. The answers denied the latter allegation, and alleged the discharges in bankruptcy and scheduling of the debts. It was stipulated that these allegations were true.

The question is whether the debts were discharged.

"Section 17 of the Bankruptcy Act (11 U.S.C.A. § 35) sets forth the effect of respondents' discharge in bankruptcy:

" ' (a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, . . . except such as . . . (2) are liabilities . . . for willful and malicious injuries to the person or property of another, . . . or (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity; . . .' "

Plaintiff says the debts were not discharged because (1) they were created by fraud, embezzlement, misappropriation and defalcation while acting in a fiduciary capacity, and (2) they were liabilities for willful and malicious injuries to property. Defendants resist these contentions, claiming (1) a commission merchant is not a fiduciary within the purview

of the above provision of the Bankruptcy Act, (2) there was no evidence as to the conditions or agreements under which the produce was sent them, and (3) there was no evidence of willful or malicious injury to property.

We have concluded that defendants were not fiduciaries with respect to the debts in question. In *Young* v. *Clark* (1907), 7 Cal.App. 194, 196 [93 P. 1056], the court held that discharges in bankruptcy released defendants from liability for money which they held as agents of the plaintiff and which they had refused to pay over. After quoting subdivision a, 4 of section 17 of the Bankruptcy Act of 1898, as amended, the court said: "It has been often held that the term 'fiduciary capacity,' as used in this subdivision of section 17, applies only to technical trusts, such as those arising from the relation of attorney, executor or guardian, and not to debts due by a bankrupt in the character of an agent, factor, commission merchant and the like." The opinion cited cases so holding, namely, *In re Basch,* 97 F. 761; *Knott* v. *Putnam,* 107 F. 907; *Chapman* v. *Forsyth,* 2 How. (43 U.S.) 202 [11 L.Ed 236], *Palmer* v. *Hussey,* 119 U.S. 96 [7 S.Ct. 158, 30 L.Ed. 362], *Upshur* v. *Briscoe,* 138 U.S. 365 [11 S.Ct. 313, 34 L.Ed. 931], *Noble* v. *Hammond,* 129 U.S. 65 [9 S.Ct. 235, 32 L.Ed. 621], and *Bracken* v. *Milner,* 104 F. 522.

In *Hennequin* v. *Clews,* 111 U.S. 676 [4 S.Ct. 576, 28 L.Ed. 565], the court quoted from the decision in *Chapman* v. *Forsyth,* 2 How. (43 U.S.) 202, 207 [11 L.Ed. 236], as follows: "If the act embrace such a debt, [of a factor] it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

"The cases enumerated, 'the defalcation of a public officer,' 'executor,' 'administrator,' 'guardian,' or 'trustee,' are not cases of implied, but special trusts, and the 'other fiduciary capacity' mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the laws implies from the contract. A factor is not, therefore, within

the act." The words "executor, administrator, guardian or trustee," employed in the act of 1841, which the court construed in Chapman, were not used in later bankruptcy acts (1867 to date). In Hennequin the court was considering exceptions reading the same as those first heretofore quoted, and the court agreed that if the excepting clauses were construed to include debts "arising from agencies and the like," there would remain few debts on which the law could operate.

In *Davis* v. *Aetna Acceptance Co.*, 293 U.S. 328, 333 [55 S.Ct. 151, 79 L.Ed. 393, 397], Justice Cardozo, in referring to the holding in *Chapman* v. *Forsyth,* wrote for the court as follows: "The scope of the exception was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity." (Citing many cases of the U.S. Supreme Court.) In all of these years (since the act of 1867), Congress has not seen fit to broaden the scope of the exceptions by including defalcations by those who, although not trustees in a technical sense, yet enjoy the trust and confidence of persons with whom they deal in business.

Plaintiff cites *Treadwell* v. *Holloway* (1873), 46 Cal. 547, as holding that the term "fiduciary character" used in the Bankruptcy Act of 1867, meant not only technical fiduciary relationships but also all those in which trust and confidence is reposed. It also cites *Mayberry* v. *Cook* (1898), 121 Cal. 588 [54 P. 95], which held, upon the authority of *Treadwell* v. *Holloway,* that the term "fiduciary capacity" in section 52 of the California Insolvent Act (Stats. 1880, p. 82), which employed the same phraseology as the Bankruptcy Act, had application to factors and commission merchants who failed to remit the proceeds of sales of consigned goods. As between the cryptic opinion in the *Treadwell* v. *Holloway* case, which contains no discussion of the question, and states no reasons for the decision, and the carefully considered opinion in *Young* v. *Clark* we must accept the latter as much the better authority on the point. The same is true of *Mayberry* v. *Cook* which merely followed the holding in *Treadwell* v. *Holloway.*

The decisions of the United States Supreme Court are the best authority as to the intentions of Congress in framing the National Bankruptcy Act. They were accepted as such in *Young* v. *Clark,* but were either overlooked or disregarded altogether in the earlier cases. If the Congress had disapproved of the construction which the United States Supreme

Court for nearly a century has consistently placed upon the term "fiduciary capacity," section 17 of the act would have been amended to give the term a broader meaning. We pretend to no wisdom superior to that of the many learned justices of that high court who have unanimously held to that construction, and we therefore hold that there was no evidence that the defendants were acting in a fiduciary capacity within the meaning of that term as used in section 17a, 4.

It is claimed that the failure of the defendants to pay their consignors was a willful and malicious injury to property which would prevent discharge from liability in bankruptcy. The complaint alleged that defendants "embezzled, willfully misapplied and converted to their own use money and other property belonging to produce consignors," in various stated amounts. There was no allegation that defendants acted maliciously. ■ The embezzlement described in the act is misappropriation while acting in a fiduciary capacity, and although it implies willfulness it does not necessarily imply malice. ■ And a conversion of property is not in all cases a malicious act. (*Davis* v. *Aetna Acceptance Co., supra.*) There was no evidence that defendants acted maliciously.

■ If it had been proved that defendants' failure to pay was "the deliberate commission of an unlawful act, for the purpose of injuring another" malice would have been presumed. (Code Civ. Proc., § 1962, subd. 1.) There was no evidence as to the circumstances in which the debts to the shippers accumulated, nor as to the circumstances and conditions under which defendants received shipments of produce. None of the shippers was called as a witness. Their verified claims were received in evidence for no purpose other than to prove that they had filed claims. No documentary evidence as to the terms or conditions of the shipments was received. A representative of the department testified that it was a common practice of commission merchants to use their own funds to pay consignors without awaiting payment for goods sold. ■ If it be assumed that the produce was received on consignment to be paid for when sold, the mere failure to pay the consignors was no evidence that defendants were actuated by malice. Sherman, when questioned by an attorney for the Department of Agriculture, who called the money received "trust funds," admitted that the money received on the sale of consigned goods was used in the business. But there was no evidence of its use in any other manner, nor that any of the partners made any improper use of partnership funds.

█ If it was found necessary to use the money in order to carry on the business it was to be presumed that defendants were endeavoring to retrieve their fortunes rather than to defraud their creditors. █ The presumption in favor of honest dealing (Code Civ. Proc., § 1963, subd. 19), was a presumption that under the course of business of defendants with their customers, and the circumstances of the particular transactions, defendants honestly believed they had a right to use the proceeds of sales in their business, and had every intention of paying their debts in full. It may be that the relationship between the defendants and their several consignors, or shippers, had developed into merely one of debtor and creditor, and that credit was extended at least to the extent of excusing defendants from remitting each sum as it was received. It may be that a course of dealing had been developed under which the parties understood the shippers to be sellers and the defendants buyers of the produce. The presumption of honest dealing was evidence that defendants did not act maliciously. Malice was not to be presumed.

█ Plaintiff had the burden of overcoming the presumption of fair dealing by proof of facts which would have justified an inference that defendants, in withholding payment, intended thereby to injure their consignors, or shippers.

█ Perhaps the latter, if they had testified, would have established such facts, but, since none was produced, and no excuse offered for failure to obtain testimony of the shippers, it was a fair presumption that their testimony, if produced, would have been adverse to plaintiff. (Code Civ. Proc., § 1963, subds. 5, 6.)

The absence of facts proved renders inapplicable the authorities relied on by plaintiff. It has been held that the failure of an agent to pay over money collected for his principal is a willful and malicious injury to the latter's property. (*In re Stenger* (D.C. 1922) 283 Fed. 419); that a stockbroker who makes an unauthorized sale of his client's securities and secretly appropriates the money to his own use is guilty of willful and malicious injury to property. (*McIntyre* v. *Kavanaugh*, 242 U.S. 138 [37 S.Ct. 38, 61 L.Ed. 205]; and that criminal conversion is a willful and malicious injury to property of a husband (*Tinker* v. *Colwell*, 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754]). But in these and other cases cited by plaintiff facts showing unlawful conduct were before the court from which the motive of the debtor could be inferred.

█ The case made out by plaintiff was, at most, one of

commission merchants, with a failing business, who fell behind in meeting their obligations. The trial court properly refused to presume that the defendants were embezzlers, or otherwise guilty of willful and malicious conduct. The discharges in bankruptcy constituted a good defense and warranted the judgment of nonsuit.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.